The next two cases are Alza Corp v. Mylan, No. 06-1019 and Alza Corp v. Impax Labs, 06-1047. The Alza Corp will argue continuously for 20 minutes on both cases. You will retain 10 minutes for your rebuttal. And Mr. Weiss, you'll argue for Mylan Labs. And Mr. Dinger, you'll argue for Impax for 15 minutes. Thank you very much. You may proceed, Mr. Niskant. Thank you very much. May it please the Court, I'm Gregory Niskant on behalf of Alza Corporation. The invention of the 3-5-0 patent was the first once-a-day controlled-release formulation of Oxybutynin, an incontinence drug. The invention went against the conventional wisdom, which was that controlled-release formulation should be limited to two or three times daily because it could not be reliably predicted whether any particular drug could be absorbed through the colon. And indeed, the conventional wisdom with the colonic absorption was rare, variable, and unpredictable. The inventors of the 3-5-5 patent proved that Oxybutynin could, in fact, be reliably delivered fast and efficiently through the colon and could support a once-a-day formulation. The formulation also provided unexpected benefits. One was reducing the dosing, the amount of drug that was necessary to provide daily efficacy over the previous immediate-release dosing regimen. And the other, more scientifically interesting, unexpected benefit was a reduction in side effects. It turned out, surprising the scientists who were doing the work, that when Oxybutynin was absorbed through the colon, less of its side effect was when it was absorbed through the small intestine. It turned out the desoxymetabolite is the cause of the principal side effect of Oxybutynin, which is dry mouth, and so the controlled-release formulation, by allowing reduced formation of metabolite through the colon, wound up having a significant reduction in side effects. As a result, the commercial embodiment, Ditropan XL, when launched in the United States, was an immediate commercial success and met a long-standing need for a once-a-day incontinence drug. ALSA brought suit under its patent against both Myelin and Impax, and the case before the district court in West Virginia, the Myelin case, Myelin raised, I would say, a kitchen sink of often inconsistent arguments. The result, unfortunately, was the district court accepted too many inconsistent arguments and resulted in an opinion that we believe is riddled with errors and it should be reversed. Well, why don't you focus on the legal errors that the district court made so we can get right to the issue. That's exactly where I'm going, Your Honor. Thank you. I'd like to first focus on the two anticipation rulings. The first was anticipation by Morella. Morella is a prior art patent that teaches a controlled-release morphine dosage form. It lists 150 other compounds as potential drugs to use in the dosage form. Oxybutynin is among them, and it teaches only that a therapeutic dose should be used. The district court found that Morella anticipated the 355 patent because she said that although Morella just speaks of a therapeutic dose, the claims of the patent refer also to a therapeutic dose, and that was sufficient for anticipation purposes. That is plainly incorrect. The claims of the 355 patent require particular doses of 5, 10, and 15 milligrams or a percentage dose, and this anticipation ruling is simply wrong. Impacts does not attempt to defend it. Myelin attempts to defend it, but not based on the district court's reasoning. Myelin acknowledges that there are dosage amounts in the claims of the 355 patent, which means that Morella cannot, on its face or in its four corners, anticipate. Myelin looks to the doctrine, accepted as a matter of anticipation law, that anticipation can be shown by a missing limitation that is known in the art, but that is a very narrow limitation referring to pieces of science that are simply known to the artisan. They can look them up in a textbook. They are known things like a melting point or a boiling point that may be omitted from the patent for some reason. The correct dose for that is not known in the prior art, and indeed required experimentation and assessment and analysis to determine. This was conceded by Myelin's own expert, Dr. Amidon, who testified that if he were to determine a controlled release dose for oxybutynin, he would start at 20 milligrams and go up. In fact, the claims are for 5, 10, and 15. This doesn't fit any anticipation analysis. I think the Morella ruling is legally incorrect. Just moving on from that, if we start with Bakewell, is that the way you pronounce it? Bakewell. But I may be incorrect. With respect to an obviousness analysis, what in your view is missing from Bakewell? In obviousness? Yes. Bakewell shows a quick release of oxybutynin, which reflects the conventional wisdom. All it takes is 24 hours, but if you look at each and every example, the examples show that 80% or more of drug is released in under 12 hours. What that means, that is outside the ranges of our patent. What that means is that Bakewell reflects the conventional wisdom that a dosage form should release drug quickly so as to avoid the risk of colonic absorption. That is the grounds on which the examiner allowed the patent over Bakewell, and that is why it simply does not teach the critical determination of the 355 patent, which is that slow release, linear release over 24 hours, can produce a therapeutic benefit. There's nothing in Bakewell that teaches that or suggests that. I'd be happy to continue with that if you have further questions. I wanted to hit the Bakewell anticipation. Is that all right? Well, with respect to Bakewell, while we're on it, there was a patent which required that the preparation be taken on an empty stomach. Is that correct? I didn't hear the beginning of your question. The preparation was to be taken on an empty stomach? No. Bakewell is silent on that subject. This is the anticipation case. Basically, Bakewell is silent on the subject of when the drug should be taken. Bakewell, on its face, simply discloses a controlled release formulation reflecting the conventional wisdom, prior art, of quick release, 80% or more drug released in 8 to 12 hours. I'm sorry to ask you again, but doesn't Bakewell include a 24-hour release? It says the drug is released every 24 hours, but the release is fast, so that the curve... It doesn't, so it certainly, I'm not suggesting it includes the release rates that are in the patent. It talks about 24 hours, that is absolutely correct, but the... I've drawn roughly the bands of the patent, which are a linear release, slow release over time, constant dose over time. That is the benefit of the so-called zero-order linear release. The bands in our patent define a band that includes that slow release for 24 hours, so that the patient gets the benefit of steady, constant dosing for 24 hours. Bakewell reflects quick release. Most of the drug is released in the first 8 to 12 hours, which is the conventional wisdom that because colonic absorption cannot be relied upon, it's critical to get most of your drug released in the first 8 to 12 hours. That's the critical difference between them. That's the critical difference between the invention and the conventional wisdom. But wasn't there in the record below that you acknowledged there was an embodiment of the Bakewell patent when it was taken on an empty stomach, it would meet the same requirements? Is the rate of limitations of the 355 patent? Yes. That is subsequent art. That's the point. The Bakewell itself contains no information on dosing, contains no recitation in the patent of release rates that meet the claims of the 355 patent. Afterwards, after the 355 patent, other inventors, a man named McCurry in Finland, did work with some examples from the Bakewell patent, examples 3 and 4. When he experimented with them after the 355 patent, he discovered that he obtained different release rates depending on whether the patient was taking the drug in a fed or fasted state. And he published articles demonstrating that there was a slow release, notwithstanding what would happen if the Bakewell formulation was taken on an empty stomach. And likewise, after the 355 patent, in Finland, a commercial product called Cistern CR was introduced that has that package instruction. So that sets up with the anticipation question. And the anticipation question is, the district court found that Bakewell anticipated because of these subsequent discoveries. The subsequent discoveries that examples 3 and 4, under certain conditions, could produce the slow release rates of the 355 patent. In our view, that is simply not anticipation. The reason it's not anticipation is because this court's anticipation cases, first, it's not in the forequarters of the patent. Again, I think everyone agrees on that. The court's inherent anticipation cases look to whether something is an inherent or necessary, for the missing element, whether the missing element is inherent or necessary under normal or usual operating conditions. And what that is saying, I think correctly and wisely as a matter of policy, is that if an invention has been made and the inventor has failed to appreciate something that is a necessary or inherent attribute of his creation, that that anticipates a later identical disclosure, even though the inventor hadn't appreciated that in the first instance. Your sharing case is a classic example. Loratadine metabolizes always to the desloratadine metabolite. You can't claim that as an invention. That's just the way it works. That's not true here. Here we have one taking Bakewell and simply practicing the prior art, unaware of the subsequent discoveries of Locari, might or might not take it on an empty stomach. They might or might not appreciate the benefits of linear release because there's simply nothing in Bakewell that instructs one of that. It's utterly happenstance. To turn Bakewell into a useful embodiment required not its inherent operation, but rather subsequent scientific work that is not prior art, that identified that an embodiment of Bakewell could be practiced. Let me try to, I'm getting confused about what the major, if Cistern, Cistern is the subsequent discovery. Let's assume they worked specific claims in Bakewell and they discovered that it could be taken on an empty, or a full stomach, both. Are you suggesting that even in that instance it wouldn't be inherent or anticipatory because, anticipation because it's a subsequent discovery? I'm not understanding the arguments you seem to be making based on a subsequent discovery. If it turned out, if it turned out that Bakewell, example three, notwithstanding what it's, let's assume, notwithstanding what it says in the Bakewell patent, let's assume that in real life, it turns out that it always produces slow release, that would be an anticipation. Absolutely. Absolutely. Because that would be just like the Shearing case. I thought you were critical, being critical somehow of the subsequent discovery. No, no, no. I was just separating it in time. And what I was saying is that what, Your basic argument is an inherent, anticipation by inherency requires always, not sometimes. That's exactly it. That's the entirety of the point. That's what the cases support. I think that's what good public policy supports as well. And we think the district court simply erred. And let me turn to obviousness, if I may. Obviousness, this is a classic case in our view of undocumented hindsight. As I've alluded to earlier and as our briefs recite in great detail, the conventional wisdom is extremely well documented. It was well documented in 1995 and still well documented today. If you look in, we put a copy in the brief, but if you look at JA13519, there's Dr. Amidon's teaching slides, even today at the University of Michigan. He teaches his students. We assume GI transit time of 8 to 12 hours and constant absorption over the entire length of the small intestine. Colonic absorption is unpredictable and unknown. By 1995, out of the thousands of compounds out there, ALSA had developed only seven. ALSA was the leader. Smith-Klein had identified only one. There were only 14 compounds. There were even possible candidates for control one-a-day release through the colon. Oxybutynin is not among them. And 70% of ALSA's efforts failed. It's a high-risk, uncertain exercise. The district court, I think her error is captured in one paragraph of her opinion, page 51 of the joint appendix, 50 and 51. She writes, With respect to colonic absorption, Amidon presented unrebutted and unimpeached evidence demonstrating that a person of ordinary skill in the art would reasonably expect oxybutynin to absorb in the colon. As I'll show you in a moment, in fact, this proposition was rebutted by Dr. Chancellor. Don't both Bakewell and Morella teach that this substance can be colonically absorbed? No, neither one teaches that. Morella teaches that oxybutynin is a candidate to consider and provides no reason to expect it to succeed, provide therapeutic benefits for 24 hours. And Bakewell teaches to the contrary. As the Patent Office recognized, it teaches fast release. It simply doesn't do it. The text here... I wasn't talking about the time of release. I was talking about absorption. Neither says a word on the subject, and neither implies it. I don't think the district court suggested that, and I don't think anyone has. The Dr. Chancellor sentence I won't read because my time is short, but it is completely incorrect. After 12 hours, absorption is going to happen in the colon, right? After 12 hours, the drug product will be in the colon, and the question is, what's happening? Are you getting any predictable or reliable release, or are you just getting occasional, small, unpredictable, and erratic release? And that's the problem. That's why devices like Bakewell emphasize the first 12 hours. If you want the benefits of the patent, which are linear release, constant relief over time, you need predictable, reliable, rapid absorption in the colon, and there's no suggestion in either Bakewell or Morales for that effect. But doesn't absorption really take place in the blood rather than the colon? Absorption goes from the colon into the blood, and so you're talking about two different points in time. Both are relevant variables. So you still have a gut portion and then an absorption portion in the blood and then an attrition portion in the colon, which still could have some residual type of absorption. That's all correct. The issue for purposes of this case and the obviousness analysis is, can one still in the yard reasonably expect oxybutynin when ingested orally and therefore passing for 12 hours through the colon? Can one expect the drug that is released from the drug form to be absorbed through the colonic wall? And that is what the ART said repeatedly, was highly unpredictable, variable, uncertain, not something a one of skill in the ART should count on, and that's the reason the controlled release formulations were directed towards much shorter timelines. But there was teaching in the ART that you can achieve this slow, steady release over 24 hours with some substances, right? There were... I thought that was a 757 patent referred to that subject matter. 757 is referenced in Morella, I believe. I'm not sure whether 757 does that or not. I will agree that the ART reflected that there were a handful of compounds that could be absorbed through the colon. There were 14 identified by Dr. Amidon. None of them was on oxybutynin, and there was no magic test. I mean, the real flaw, the real hindsight, the real hindsight opinion that's not based on fact is the assertion that in 1995 one would know that a lipophilic drug would rapidly and well be absorbed in the colon. So you're saying... I think Wong is one of those that specifies the exact release rates, right? The muscle relaxant. You're saying that even though the drug is a muscle relaxant, you're saying that that doesn't cover it. That's right, and the District Court agreed with that. But let me draw a distinction. It was known in the ART how to create a pill that would release for 24 hours. That's what Wong does. It was known how to do that. The question is when you put a drug in that pill and released it for 24 hours, what was going to happen? Were you going to get 24 hours of linear benefit or were you going to get erratic benefit in the bloodstream? And Wong doesn't really address that at all. What Wong says is here's my carrier, here's my pill. Wong actually says you could put sand in it or release anything reliably for 24 hours. The next step is that steady release in the GI tract going in turn to lead to a therapeutic benefit in the blood that requires the drug to get through the wall of the colon. That's what the ART viewed as uncertain, unpredictable, unreliable. And what Dr. Amidon elevated with hindsight into a magic bullet, contrary to his written articles in which he, like Dr. Chancellor, viewed it. What I was referring to earlier, I see it's 1702 in the record where they're talking about whether it would have been obvious to one of us still in the ART to vary the proportion and or the total weight of the tablet, you can achieve different slow release profiles and may extend effective dissolution over a period of time. That was known. Yes, but that is referring to the dissolution rate of the formulation in the GI tract. That is, you can adjust what the pill does in terms of releasing drug that doesn't get to the next scientific question. Okay, now you have created a pill that you can control its release rate. Is that doing any good or is the drug just accumulating in the colon? So you've got to be careful in looking at the ART to keep separate the development of technologies for drug formulations, which was a very active and sophisticated ART, and the separate question of whether these very clever formulations could nonetheless deliver drug through the colon, and on that subject the... Mr. Diskin, you're well into rebuttal time. Let me take a brief moment. Can I take a brief moment on infringement and then sit down? Go ahead. Is that all right? One minute. One minute. Okay, on infringement I think it's pretty simple. On infringement the district court did one standard for invalidity and a tougher standard for infringement, and that was backwards. If you read JA 1720, 1895, 96, and 97, you will see Milan proving through the use of apparatus number three in vitro testing that Morella formulations release in vitro under the claims of the patent and therefore meet the claims and put it in fringe. The court accepted the showing that Morella practiced the claims of the patent, the Morella embodiments, for the purpose of the invalidity case. The exact same number three testing done by the exact same party, Milan, using a polymer matrix drug was found insufficient for purposes of infringement. I think the infringement errors are many and cannot be corrected on appeal, but I respectfully ask that the case be remanded to the district court to do the fact-finding that should have occurred in the first instance. Thank you. Thank you, Mr. Krishnan. Mr. Weiss? May it please the court, I represent the Milan, and I believe impacts will be arguing after me. In the court below, we had a full evidentiary trial, ten days, most of it extensive scientific information. Judge Keeley issued a very careful 57-page opinion. She found they failed to prove infringement. She found that the patents were invalid based on the prior art. Let me turn first to infringement. This affects the Milan products. This is a principal issue for us. It is an issue on which ELSA has the burden of proof, although in their brief, their opening brief, I think they spent four pages and only a minute here at argument. The critical focus of the infringement argument is that each and every claim has in it an express quantitative limitation as to either their percentage or the milligram amount of oxybutynin that is released at the end of four hours, eight hours, 14 hours, and 24 hours. Judge Keeley had a marking ruler, and at ELSA's insistence, she interpreted that release to be a release that you had to prove how does it release in vivo, in the human GI tract. That claim construction is not challenged on appeal. When we got to trial, as Judge Keeley's opinion makes clear, ELSA failed to offer any evidence, any competent evidence, showing what was the actual quantitative release of the Milan product inside the human GI tract. Instead, ELSA advanced two arguments advanced by its counsel, which are repeated in their briefs here to this court. The first one is based on so-called FDA regulatory, quote, bioequivalence. The second one is based on a handful of cherry-picked in vitro tests under special conditions. And let me address, start, as Judge Keeley did below, with the FDA bioequivalence argument. Bioequivalence is this entire argument is based on a subjective comparison by ELSA's counsel in their brief comparing blood plasma concentration curves that for the Milan product compared to the commercial Ditropan XL product. These are curves that you must submit to the FDA as part of regulatory approval. The curves show the appearance in the bloodstream of oxybutynin. I think as Judge Gallarza pointed out, this is after release, absorption, metabolism, distribution, and excretion. It is a result that is the result of all these fundamental competing processes going on at once. For FDA purposes, the only things they care about, there are only two parameters they care about. One is how high is the peak, the Cmax. The second one is let's look at the total area under the curve over a full 60 hours. If you are within, I think it's 80% to 125% for FDA regulatory purposes, those are deemed to be bioequivalent. As Judge Keeley found, however, the mere fact that two drugs are bioequivalent for FDA purposes does not tell you anything at all about what is the actual quantitative amount released inside the GI tract at 4, 8, 14, or 24 hours. Moreover, all we have in the record in this case was ALSA counsel's subjective arguments based on these curves, which they argued to Judge Keeley below. And as Judge Keeley found, there was no expert who endorsed ALSA's comparison of those blood levels. And in fact, the one thing they pointed to, which was Dr. Amidon, when he was asked about this comparison, he flatly refuted it. She repeats his testimony in her opinion. So what we have in sum on the bioequivalence is Judge Keeley correctly found that there was no factual support for that argument, and the argument looking merely at these curves and trying to make a comparison does not provide you any specific information about quantitative amounts released in the human GI tract at the critical time periods. Let me turn now to the in vitro tests that ALSA offered. All of the experts, all of the witnesses agreed. Judge Keeley expressly found that it was undisputed that when you take the Mylan product and you test it in vitro, as in little dishes and apparatuses, the results vary all over the lot. The results vary, quote, radically, as she said in her opinion, depending upon which apparatus you take, whether it's paddles or dippers or baskets, and most critically on how fast you agitate it. In fact, one of the witnesses at trial said, you know, I'm in charge of this area. You know, I can run it either fast enough or slow enough. I can give you any kind of release you want in these in vitro tests. What Judge Keeley found, correctly so, and as the testimony supported, was that these in vitro tests are used for manufacturing quality control purposes. The FDA requires them. They ensure batch-to-batch uniformity. They are not designed to mimic something that's going on in the human body. In fact, in our brief following page 34, we have a chart where we show all the different tests when you run them in different standardized tests, and they vary all over the lot, although I think all but one out of eight or ten tests show non-infringement when you use the in vitro. Both our expert, Dr. Amidon, and ALS's expert, Dr. Barr, have testified that you cannot use in vitro test data to determine in vivo release just standing by themselves. It cannot be done. The only way you can do, have some use like that, is where you then also do in vivo measurements and do a special correlation to show that it has some meaning. ALSA avoided summary judgment by saying, we're going to bring Dr. Barr in, and he's going to do what's called a deconvolution analysis. He's going to make calculations and show from the blood plasma data what it really means going on inside the body. At the last minute, they jettisoned Dr. Barr. He never appeared at trial. In response, we called Dr. Amidon, who was very familiar with the deconvolution analysis. We said, well, look at the data that Dr. Barr had. What does it show? And Dr. Amidon said, well, if you look at it, and you really look at it and understand what it shows, it shows non-infringement. Why was it not infringing, though? Was it because it was outside of the range? Yes. When you do the deconvolution analysis, and, in fact, on page 35 of the Milan red brief, we've superimposed the deconvolution data on top of most of the in vitro tests, which all fall well below the claim limitations. They are all consistent, and they all show non-infringement. But I think the important thing is here, it's not our burden to prove non-infringement. Whether or not you consider the deconvolution data or not, I don't care. We took what Dr. Barr said he was going to use, had Dr. Amidon address it, but the burden is on ELSA. Judge Keeley heard 10 days of testimony. She correctly found that all ELSA gave was attorney argument. They did not come forward with specific technical information that would actually show you the quantitative amount released. What kind of technical information would make that showing? Assume the burden was on you and you were ELSA and you were trying to prove infringement. What kind of tests can you run and make measurements to show infringement in vivo? A properly done deconvolution analysis is probably the best way. Absent doing an intubation study, Dr. Barr does lots of intubation studies for ELSA. There's gamma scintigraphy. In the record, we showed there were a number of different tests that could be done. But deconvolution is probably the simplest one, if done right. How does that work? Deconvolution is you take the data showing how it appears in the body. You run it through a complex program, which will back-calculate and take out the elements of excretion and absorption. Are you using blood tests? How do you know what's going on inside the body? How do you know how much of a substance is being released at any point in time? Because the patient is taking it. You're taking blood samples every 2, 4 hours. You are running through the computer against a separate test, which puts an IV dose directly into the bloodstream. So that lets you back out and back-calculate precisely how that's done. And as Judge Keeley found, that's the next best way to having a gamma scintigraphy or an intubation study. It's well accepted. They didn't offer it. When we took their data, which we got at their deposition, we showed that it was, if anything, if it's considered at all, it proves non-infringement. Let me go on to the Morella reference, which is the first round that Judge Keeley found invalidity on. First, there's no question that Morella is 102B prior art. Secondly, as Judge Keeley found, there is no question that Claim 2 of Morella specifically teaches a sustained release polymer matrix formula that uses oxybutynin as an active ingredient. Third, there is no question that Morella's specifically claimed formulation parameters will produce a product that falls squarely within the claim limitations of the 355 patent. Judge Keeley so found based on the evidence presented at trial, based on ELSA's concession in its post-trial brief, and indeed ELSA's expert itself who addressed the Morella patent, Dr Peppis, at trial transcript 510, and this is not in the joint appendix, this is one of those things that got left out accidentally, but in trial transcript 510, Dr Peppis was specifically asked, well, if you use the Morella formulations and use routine experimentation, that will give you something that comes within the claims of the 355 patent. He said yes, that it does. So you're saying that even though Morella itself fails to disclose specific therapeutic amounts, that that void is filled by that line in the testimony? No, I'm talking about release rates. I'll go on and I will now address, Your Honor, the question of the special therapeutic amounts, which is the only argument that ELSA advanced in their brief against what they said was missing in Morella, that it doesn't somehow tell you the 5 mg, 10 mg, and 15 mg amounts that appear in some of the claims, but not all the claims. Claim 1 has no amounts in it, nor does claim 11. That argument, Your Honor, is incorrect, as the record evidence shows. Morella specifically teaches using a therapeutically effective amount. The basic question is, what does that teach one skilled in the art? And the answer is, we put all this in at trial. ELSA's own expert at trial admitted that oxybutynin had been around for decades, decades, and that there was a standard therapeutically effective amount that was well known to those skilled in the art would be a total daily dose between 5 mg and 20 mg. And I refer the Court specifically to the joint appendix at page 16234, which is where Dr. Demochowski, who was ELSA's expert, he said, what's the basic dose? He said it's either a 2.5 mg tablet or a 5 mg tablet given 2 to 4 times a day. Well, that's simple arithmetic. That is everything within the range of 5 mg at this end up to 20 mg at the other end. We also put in the record the standard prescriber's journal, a thing the physician would go to look up to say, what do I prescribe for oxybutynin? This appears at the specific page is JA6779, where it states that the adult therapeutic dose starts at 2.5 mg twice or three times daily and increased according to response to a maximum of 20 mg daily. Once again, this is exactly what their expert admitted. Everyone knew, anyone skilled in the art knew that the standard daily dosage that you would use for a patient, it varies from patient to patient, but it's going to be somewhere between 5 up to 20 mg, and that fully includes 5, 10, and 15 mg amounts that are recited in some of these claims. Isn't your adversary arguing that all that, the total amount of the maximum amount that the human can endure or the maximum amount you want to give may have been well known, but that what was not known until Alza showed up was that you could have a formulation that would provide a uniform slow release over a total 24-hour period? Morella teaches that. Morella teaches you formulations that will give you precisely that kind of release. The only thing missing that they say from Morella is, well, what therapeutic amount do I put in there? Our point is, anyone reading Morella, one skilled in the art knows it's going to be between 5 and 20 mg. That was well known. You don't write these patents to put in for every drug, everything that is there. Preferably, you don't put into the patents the stuff that is well known, which in the case of oxybutynin is that the 5 to 10 mg is, I'm sorry, 5 to 20 mg is the standard dose. Let me just do very quickly on Baych-Wall. They said that the critical difference on Baych-Wall is that it goes too fast, dissolves too fast. Well, that's based on in vitro tests under conditions, paddles at 50 agitations per minute, which we would fail. It does not address Baych-Wall in vivo, which is what these claims mean. At trial, their expert, Dr. Peppis, conceded that in vivo, when you give the Baych-Wall on an empty stomach, it clearly anticipates. Finally, on just colonic absorption, if I could just to correct the point, it gets into the colon after 3 to 5 hours. That's what the patent teaches. Colonic absorption, Dr. Chancellor, who they cite to, at trial, we asked him, we said, well, have you looked at the state of the art? Have you done a literature review? No. I'm just telling you that I wasn't aware of it. In response to that, we called back Dr. Amidon, and this is at pages 2005 through 2007. He went through 2005 through 2074, and the exhibits that we went through with him, we went through literally two dozen references where he went back to address the state of the art of colonic absorption. Judge Keeley heard his testimony. It was unimpeached. It was unrebutted. As of 1995, one of ordinary skill in the art would have expected oxybutynin to be absorbed in the colon. Thank you, Mr. Wise. Thank you very much. May I please report? One preliminary point. Even if the court finds that the Mylan product does not infringe the 355 patent, this court still needs to reach the invalidity issues presented here because of the impacts case. Because the court in the impacts didn't reach infringement, but pursuant to a stipulation of the parties, entered a judgment of invalidity. So you have to deal with invalidity, and those are the issues to which I will direct my attention this morning. And let me begin with the op- It's really this afternoon, but that's all right. Time flies when you're having fun, Your Honor. Let me start with obviousness. Here's the analysis that I think requires that the judge's finding of obviousness be affirmed. We start with the Wong patent. The Wong patent teaches everything the 355 patent teaches, except it does not specifically mention oxybutynin. Specifically, it teaches a release rate within the scope of the 355 patent. Indeed, it teaches that you can formulate almost any drug using that release rate. If you look at figure 11 of the Wong patent, which is on JA5795, I didn't see the chart that Alza's counsel drew, but I suspect it looks something like this. This is a linear release. And Wong teaches that you can formulate an extraordinarily broad range of drugs to achieve that. And among the drugs that Wong teaches you can use to get this kind of release rate are muscle relaxants and urinary tract drugs. And it has been already observed to this court, oxybutynin had been around for decades as a well-known muscle relaxant and urinary tract drug. So even just looking at Wong, a person of ordinary skill in the art, would have been motivated to use this osmotic pump technology to formulate an oxybutynin extended release formulation. Now, Alza says, yes, but a person of ordinary skill in the art wouldn't do that because the person of ordinary skill in the art would accept conventional wisdom that oxybutynin wouldn't absorb in the colon. The problem is the prior art taught the contrary. The Morella and Bakewall patents both taught 24-hour therapeutic formulations of oxybutynin. Now, therapeutic is an important word in that context. The evidence at the trial was clear that an oral drug reaches the large intestine of the colon in about four to four and a half hours. If a drug does not release in the colon, then you're not going to have a therapeutic 24-hour formulation. And both Bakewall and Morella teach 24-hour therapeutic formulations of oxybutynin. And, indeed, Morella specifically refers to colonic absorption. Page 5768 of the record of the joint appendix. Morella teaches with regard to all of the drugs that he is including in his patent, absorption will occur in the small intestine. But since absorption will continue over an extended period of time, which it would have to be a 24-hour therapeutic formulation, additional absorption will occur some way into the large intestine. You simply can't have a 24-hour therapeutic formulation without colonic absorption. Moreover, the evidence during the Milan trial, there was ample evidence that by 1995, there were a number of drugs that absorbed in the colon, including drugs that shared many characteristics, including high lipophilicity, with oxybutynin. The judge's finding that a person of ordinary skill would not be discouraged by what Alza calls the conventional wisdom and would use Wong to formulate an oxybutynin formulation with a reasonable expectation that it would succeed, not simply that it was obvious to try, but there was a reasonable expectation it would succeed, that finding is not clearly erroneous. And Alza really doesn't make an argument that it's clearly erroneous. There was ample evidence to support the trial judge's conclusion. And it should be affirmed. Now let me direct my attention to the Bakewell anticipation argument. The reason, I submit, why this court has adopted the inherent anticipation doctrine, and more important, the reason why the court does not require the inherent characteristic of the prior art to be known to persons of ordinary skill in the art, turns on a very fundamental proposition of patent law. And that is that the public may not be deprived of the right to practice the prior art in accordance with its terms under normal, foreseeable, usual circumstances. The reason why Bakewell anticipates the 355 patent is that if the 355 patent is valid, the public will be deprived of the right to practice the art taught by Bakewell. Bakewell examples 3 and 4, the parties have agreed, have stipulated, that the cistern product is an embodiment occurred simply by practicing the formulation taught in the Bakewell examples. So the public has the right to do that. The 355 patent, according to Alza, will stop that. They've been absolutely clear at the trial and in their briefs that if someone tried to sell this embodiment of the Bakewell patent in the United States after the issuance of the 355 patent, it would infringe. Now, the maxim, which Alza pooh-poohs, that what infringes if later, anticipates if earlier, in fact reflects this fundamental proposition of patent law. You cannot, a patent simply cannot, stop the public from practicing the prior art under normal circumstances. And that is why... Your adversary is saying that's all well and good, but the maxim of that which infringes later anticipates it earlier in the 102 setting requires you to say that which always infringes in every iteration, if later, will then always anticipate it earlier. They're saying with respect to the inherency by anticipation that you ought to be certain that you know that you're invalidating the right patents, that you should have a situation in which the thing that's being claimed always was occurring at some earlier stage, always. Yes, I understand that that's their argument, but I'm suggesting that that is too great a restriction on the ability of the public to practice the prior art. Bakewell teaches a particular formulation for the specific purpose of treating oxybutynin, for the specific purpose of treating oxybutynin with a 24-hour therapeutic formulation. So a person reading Bakewell, and let's assume that Bakewell has expired or is licensed, can see that and say that's a great idea. I'm going to use that to treat my urinary incontinence patients. That party has the right to practice it with fed patients, with fasted patients. Then the 355 patent comes along, and they say, well, you've got to stop doing that because at least when administered to fasted patients, you're going to infringe the claims of our patent. That's right, but the conclusion is that the 355 patent cannot stand. In a sense, what the three... But Bakewell does not cover either or both. It doesn't state, does it, whether it's full or an empty stomach type of a medication? It doesn't say one way or the other because neither does the 355 patent. The point is that you're allowed, because it is the prior art, because patents cannot impoverish the public domain, the public has a right to practice Bakewell with patients on an empty stomach, with patients who have just finished breakfast, and anything in between. And the 355 patent cannot take that away from the public, and it is for that reason that Bakewell anticipates... I mean, the Supreme Court said in the Graham case, Congress may not authorize the issuance of patents whose effects are to remove existent knowledge from the public domain or to restrict free access to materials already available. This court, in the Atlas Powder case, said in substance the same thing. If granting patent protection on the disputed claim would allow the patentee to exclude the public from practicing the prior art, then that claim is anticipated, regardless of whether it also covers subject matter not in the prior art. And that's what we are standing on here today. It cannot be the law, at least cannot be the law consistent with these fundamental principles of patent law, that inherent anticipation applies only when, under every normal and foreseeable circumstance, the characteristic is present. Because the public is entitled to practice the prior art under any normal foreseeable circumstance of operation. But it can practice it under certain circumstances but not under others. It can't practice it under all. But there was no limitation in Bakewell. The public is entitled to practice the Bakewell examples in accordance with their terms, which are not limited to fasted or fed. Therefore, the subsequent art, the 355 patent, cannot prevent the public from practicing Bakewell in accordance with its terms. But it doesn't say what the terms are. It doesn't limit the terms. And I'm saying that as long as the circumstances are normal, foreseeable, and there was no dispute that that was the case. It is the commonest thing in the world for patients to take a prescription drug on an empty stomach. We've all done it. Therefore, it is foreseeable, the trial judge found, and now it doesn't dispute, that it was entirely foreseeable that somebody practicing the Bakewell art would take the formulation on an empty stomach. The 355 patent can't stop people from doing that. They can't put a halt to practicing the prior art. And that, in essence, is the inherent anticipation argument. I find myself unaccustomedly... You said more questions than this. I'm happy to answer questions. But if you have no further questions... Do the court a favor. I'm sorry? It's late. Enjoy your lunch. Thank you. I'll briefly hit a few points, if I may. With respect to Morella, the issue is pretty simple. The dose is not in the prior art for a controlled-release formulation. Look at Dr. Amidon's testimony at JA 1783-84. There is no way that a dose for controlled-release oxybutynin formulations can be determined except through experimentation. That's not anticipation for purposes of Morella. For purposes of Bakewell, if Cystrin CR were sold in the U.S. today, it would be using teachings not in Bakewell. It would be using the later discovery of Lucari, and it would infringe. We're not contending that you can't practice the prior art. We are contending, however, that Bakewell doesn't anticipate when it does not disclose the full contours of the 3-5-5 patent, and it's not inherent in its practicing. It's just like Example 32 in the black-soap case. Example 32 most of the time produced Form 2 of ritididine, which would have anticipated. Sometimes it produced Form 1. Well, you could practice the prior art. You could make Example 32. Often it would be producing the subsequent invention, but sometimes it wouldn't, therefore it didn't anticipate. That's the anticipation laws. We understand it, and we think the court was simply wrong. With respect to obviousness, Mr. Weiss talked about how Dr. Amidon reviewed the art on colonic absorption, the art on colonic absorption, as his continued failure to cite anything demonstrates, does not provide a fact-based support for his conclusory testimony, which came out in this passage on page 1951 of the transcript. He said, I indicated in my testimony there's a high degree of scientific belief in absorption from the colon for a lipophilic drug. I said, Question, you can agree that the articles we've looked at so far haven't said anything like that. Answer, we have not looked at any particular statements like that. Correct. And there aren't any. In fact, what the prior art in fact reflects is Dr. Amidon's own article from 1996. The absorption of drugs from the gastrointestinal tract is very complex and often not well characterized. Many factors affect the extent and rate of drug absorption. They include PKA, solubility, stability, diffusivity, lipophilicity, salt surface area, particle size, crystal form, and he goes on and on and on. There are no silver bullets. And this is classic hindsight, classic conclusory opinion that should be rejected because it's not fact-based. And with respect to infringement, we are faulted for not having evidence in human patients, such as the convolution evidence, intubation studies, gamma scintography. We have a Hatch-Waxman case in which the compound that we're challenging is not approved by the FDA for human use. It was uncontradicted at trial, but doing experiments, that we doing experiments with myelin's unapproved product in humans would be unethical. Now, we understand fully we're bound by our claim and we have to prove our claim, but we can't be faulted for not having evidence you can't ethically obtain. Here's the evidence we did have, should have been sufficient to meet the burden of proof. The evidence we did have was a design to mimic the release of Ditropan XL, which releases linearly in the bloodstream. A tentative approval from the FDA for a package insert that recites that the ANDA product releases constantly in the GI tract and produces steady concentrations in the bloodstream. In vitro testing... Why would it be unethical to do the testing? It would be unethical to test an unapproved drug in humans. You need approval from the Institutional Review Board and informed consent. As a general matter, scientists do not like or approve human testing for litigation purposes. And when you compound doing human testing for litigation purposes with the additional complexity that we have drug that we received in the mail from Milan that has not been approved by the FDA for human use, all of our experts, and I have never met one who disagreed, so testified that that was unethical. You could not do it. It would not be appropriate to test unapproved drugs in humans for litigation. Certainly you test unapproved drugs as the sponsor, subject again to the same strict IRB approval and informed consent when you're trying to get approval to have the drug prescribed for treating patients. It's a completely different set of circumstances in which you both control the drug and also are doing it for science, not litigation. But that's the undisputed evidence, and I think IMPAX agrees, and it's brief. But in any event, we had all this evidence. That just sort of puts you between a rock and a hard place then, doesn't it? It limits the proof we can rely upon. That's absolutely correct. It presents the question whether we've met our preponderance burden. And I believe that if you compare the district court's findings and testimony with respect to in vitro testing, for example, how can it be that apparatus number three testing, 25 dips a minute performed by Milan, proves Morella embodiments infringe and the same testing apparatus number three, 25 dips a minute performed by Milan, is insufficient to prove infringement by a Milan Xander product? It's the same test done by the same party proving the same release rates. I think a double standard was in play, and the double standard went the wrong way. We're entitled to the lower burden on infringement. I think the court erroneously did not look at the scientific evidence and instead cabined it looking at saying in vitro was insufficient. When the evidence was, it was sufficient. Not considering the benefits of what in vivo evidence there was. And I see my time is up. Thank you very much. Thank you, Mr. Bishop. Good cases have taken under advisement.